**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Randy Blough, et al.,** | ) | **CASE NO. 1:14 CV 263** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **Voisard Manufacturing, Inc. et al.,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendants.** | ) | |

### Introduction

This matter is before the Court upon Plaintiffs' Motion for Summary Judgment (Doc. 33) and Defendants' Motion for Summary Judgment (Doc. 35). This case aries under the Worker Adjustment and Retraining Notification Act. For the reasons set forth below, plaintiffs' motion is GRANTED IN PART and DENIED IN PART and defendants' motion is GRANTED IN PART and DENIED IN PART.

### Facts

Plaintiffs Randy Blough, Charles Burks, Christopher Caskey, Lyle Chrominster, Joseph Faith, Denver Gibson, Timothy Harley, Josh Kennedy, Marsha Kilgore, Gary Pringle, Tom Schroeder, Heath Stephens, Kenneth Stephens, Rick Thomas, and Jonathan Warren-

1

Anderson, on behalf of themselves and all others similarly situated, bring this action against Voisard Manufacturing, Inc. ("Voisard"), LG Industries, LLP ("LGP"), and LG Industries, Inc. ("LGI") (collectively "defendants").

Plaintiffs were employed by Voisard, a metal fabrication company. LGP purchased Voisard in 2003 and is its sole shareholder. LGI is the managing partner of LGP. Ronald Constein and William Walker are the only two limited partners of LGI. Both served as officers and directors of all three companies. (Walker Dep. 15). LGI and LGP have no employees and no other operations. (Walker Decl. ¶ 4, 6). Walker and Constein controlled the employment and financial decisions at Voisard since 2003 and were its only two corporate officers. (Walker Dep. 29, 33-34). From 2003 until June 2013, Voisard paid LGP management fees totaling 2.697 million dollars which Walker and Constein split evenly.

Near the end of 2012, Voisard's largest customer, Grove Crane ("Grove") changed its purchasing patterns. As a result, Voisard lost a large amount of work and experienced a decline in overall sales throughout 2013. (Walker Decl. ¶ 10).

Beginning in spring 2013, Voisard processed several reductions in its workforce. Eight employees were laid-off on March 22, 2013, sixteen on April 5, 2013, ten on April 19, 2013, five on September 6, 2013, five on September 13, 2013, and twenty-seven on September 27, 2013. (Doc. 35-3 Ex. C). By letter, employees were informed that the layoff was "necessary to offset our customer's sales reductions." Employees were provided information on unemployment and COBRA. In closing, the letter read: "We hope that this will be a temporary situation and we can get everyone back to work as quickly as possible" and provided a telephone number for Sharon Emmer ("Emmer"), Voisard's HR manager.

2

(Doc. 37-4).

Pursuant to its employee handbook, Voisard maintained a seniority policy, which provided laid-off employees with recall rights for up to one year. (Doc. 36-1; Doc. 37-7 p. 12).  Customarily, layoffs at Voisard were never permanent. (Emmer Dep. 199).  And Voisard had always brought back employees. "But they always, I probably could count on one hand how many employees that [Voisard] . . . didn't bring back." (Emmer Dep. 48-49).

On October 31, 2014, Chris Crall, Voisard's manufacturing manager, conducted a meeting with all employees to review the company's status for the 4th quarter of 2013. (Doc. 37-7).  Indicating that sales were low which created a need to review staffing for the remainder of the year, Crall informed employees that Voisard would be shutting down for three weeks, during the weeks of Thanksgiving, Christmas, and New Year.  During these shut-down weeks, no one would be approved to take any vacation days. (Doc. 37-7).  Employee pay was also cut 20% around this time. (Kilgore Depo. 60:4).

Throughout 2013, Voisard was engaged in a series of discussions with its lender, TD Bank, to consolidate its operation in response to the decline in sales. (Walker Decl. ¶ 14).  During the previous decade, TD Bank had permitted Voisard to modify its loan agreement five separate times. (Walker Decl. ¶ 15).  In June 2013, Voisard entered into a loan modification, allowing Voisard to be overdrawn on its line of credit by $375,000 at the end of any given month to pay expenses, such as payroll ("overdraft"). (Walker Decl. ¶ 16).  The increase was meant to be temporary and set to expire on August 31, 2013. (Walker Decl. ¶ 17).  When Voisard was not in a position to reduce the overdraft in August, TD Bank allowed Voisard to continue to utilize its line of credit under the latest modification. (Walker Decl. ¶

3

18).

Voisard continued to discuss reducing the overdraft with TD Bank throughout the fall of 2013. (Walker Decl. ¶ 19).  On December 4, 2013, TD Bank's workout department informed Voisard that the $375,000 overdraft was their limit and that the line of credit needed to be reduced and ultimately extinguished. (*Id*.; Walker Dep. 40:8-12).  Voisard and TD Bank began considering ways to reduce the overdraft without precipitating the demise of Voisard. (Walker Dec. ¶ 20).  Discussions focused on further reductions in the workforce and sale of the company. (*Id*.)

On January 8, 2014, TD Bank stated that it wanted to accelerate reduction of the overdraft amount, reducing it to $300,000 immediately and $225,000 by March 31, 2014. (Walker Decl. ¶ 21).  Walker responded that this would be detrimental to the company, making it difficult to pay vendors and employees, which would further reduce Voisard's ability to increase sales. (Walker Decl. ¶ 21).  Discussions on how to reduce the overdraft continued throughout the month.

On January 28, 2014, the results of the inventory and sales for November and December were finalized and it became clear that Voisard would be overdrawn by $425,000 on its line of credit on December 31, 2013 and as much as $500,000 as of January 31, 2014.

At a meeting on January 29, 2014, TD Bank told Voisard that it would not advance any funds in excess of the $375,000 overdraft.

On January 31, 2014, Voisard laid off 72 employees while temporarily maintaining fifteen others. (Walker Decl. ¶ 23).

Plaintiffs thereafter brought suit, alleging defendants violated the WARN Act by

4

failing to give them 60 days' notice before the mass layoff at Voisard on January 31, 2014.

This matter is now before the Court upon the parties' cross motions for summary judgment.

### Standard of Review

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing Fed.R.Civ.P. 56(c)); see also *LaPointe v. UAW*, Local 600, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed.R.Civ.P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc*., 8 F.3d 335, 340 (6th Cir. 1993).  The nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't. of Transp*., 53 F.3d 146, 150 (6th Cir. 1995).

The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)*;*

5

*Eastman Kodak Co. v. Image Technical Servs., Inc*., 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc*., 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249–50 (citation omitted).

### **Discussion**

The Worker Adjustment and Retraining Notification ("WARN") Act requires that certain employers give affected employees, state dislocated worker units, and local units of government at least 60 days' notice before any plant closing or mass layoff. 29 U.S.C. § 2102(a)(1).  The purpose of the WARN Act is to:

> provide[ ] protection to workers, their families and communities by requiring employers to provide notification 60 calendar days in advance of plant closings and mass layoffs. Advance notice provides workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market.

20 C.F.R. § 639.1(a).

Plaintiffs bring this suit alleging a violation of the WARN Act because defendants did not provide them with the requisite notice before the mass layoff on January 31, 2014. Plaintiffs and defendants move for summary judgment on the issue of Voisard's status as an employer under the WARN Act.  Defendants move for summary judgment arguing that the

6

business circumstances exception relieves them of liability.  Both sides move for summary judgment on LGI and LGP's status as a "single employer" with Voisard.  Finally, defendants move for summary judgment on plaintiffs' state law claims.

### I. Voisard's WARN Act "Employer" Status

Title 29, U.S.C. § 2101(a)(1) defines an "employer" as a business enterprise that employs 100 or more employees, excluding part-time employees.  The point in time at which the number of employees is to be measured for the purpose of determining coverage is the date the first notice is required to be given. 20 C.F.R. § 639.5(a)(2).  Here, the parties agree that the "snapshot" date is December 2, 2013, 60 days before the January 31, 2014 mass layoff. (Doc. 34 p. 7; Doc. 35-1 p. 10).

The WARN Act does not define "employee."  However, the Sixth Circuit has held that "employees" include temporarily laid-off employees who have a "reasonable expectation of recall" at the time of the employment loss. *Kildea v. Electro–Wire Prods.*, *Inc*., 144 F.3d 400, 405 (6th Cir. 1998); *Damron v. Rob Fork Mining Corp*., 945 F.2d 121, 123 (6th Cir. 1991); *see also* 20 C.F.R. § 639.3(a)(1) ("Workers on temporary layoff or on leave who have a reasonable expectation of recall are counted as employees.").

The "reasonable expectation of recall" inquiry is an objective one. *Kildea,* 144 F.3d at 406."[T]he question is not whether the employees in the case at hand believed they had a fairly good chance of being recalled," but rather, "whether a 'reasonable employee,' in the same or similar circumstances as the employees involved in the case at hand, would be expected to be recalled." *Id.*  To analyze the reasonableness of this expectation, the Court considers several criteria which parallel those used by the National Labor Relations Board

("NLRB") in interpreting the same phrase in the National Labor Relations Act, namely, (1) the past experience of the employer; (2) the employer's future plans; (3) the circumstances of the layoff; (4) the expected length of the layoff; and (5) industry practice. *Damron*, 945 F.2d at 124; see also *Kildea*, 144 F.3d at 406.

It is undisputed that Voisard had 97 employees on its payroll on the snapshot date. (Doc. 35-1 p. 10).  Plaintiffs maintain that the 28 Voisard employees that were laid-off within six months of January 31, 2014 had a reasonable expectation of returning to work.  Adding these laid-off employees to the 97 employees on the payroll pushes Voisard over the 100 employee threshold for WARN Act liability.  In support, plaintiffs point to Voisard's recall policy, which provides employees with recall rights for one year after they were laid-off. Relying on Emmer's testimony, plaintiffs note that Voisard had in the past always brought back employees. "But they always, I probably could count on one hand how many employees that [Voisard] . . . didn't bring back." (Emmer Dep. 48-49).  Emmer further testified that past layoffs were never permanent.  (Emmer Dep. 199:9-11).  Plaintiffs note that the layoff letters expressed a desire to get the employees back to work and did not indicate the layoffs were permanent.  Additionally, Walker and Emmer both testified that they did not expect the mass layoff in January to occur. (Walker Dep. 49; Emmer Dep. 199).  Taking these facts together, the laid-off employees had a reasonable expectation of recall.

Defendants contend any expectation of recall the employees had was not reasonable. Defendants emphasize that the layoffs that began in 2013 were unlike those in Voisard's past and were done in response to loss of work from Grove.  Employees were not told how long the layoffs would last.  Voisard had processed layoffs throughout the year, shut down

8

operations for three weeks, and cut employee pay.  The company also had no future plans to expand.  Applying the NLRB factors to this case, plaintiffs cannot show that the laid-off employees had a reasonable expectation of recall.

Upon review of the summary judgment record and the relevant caselaw, the Court is unable to say that either side is entitled to summary judgment.

The record in this case supports a reading that those employees laid-off by Voisard from September 6, 2013 onward could reasonably have held an expectation of recall.  By longstanding policy, laid-off Voisard employees had recall rights at the company for one year following their layoff, a factor that weighs in plaintiffs' favor. *See Kildea v. Electro Wire Products, Inc.*, 144 F.3d 400, 404 (6th Cir. 1998) (affirming the district court's finding after a bench trial that laid-off employees who had retained their seniority rights during the layoff had a reasonable expectation of recall).  Voisard had a past policy of bringing back laid-off employees. (Emmer Dep. 119, 202).  Emmer expected laid-off employees to be brought back until the mass layoff in January 2014. (Emmer Dep. 219)  And Walker, Voisard's co-president, did not expect there to be a mass layoff. (Walker Dep. 49).

On the other hand, there is evidence that Voisard was in a different financial position in 2013 than earlier when it had laid-off employees.  Letters sent to employees stated the layoffs were "necessary to offset our customer's sales reductions." (Doc. 37-4).  Loss of sales is an objective factor indicating that laid-off employees have no reasonable expectation of recall. *N.L.R.B. v. Seawin*, Inc., 248 F.3d 551, 555 (6th Cir. 2001).  Voisard shut down operations for three weeks and employee pay had been cut.  There is no evidence that the company had any future plans to expand.

9

Consequently, both parties have some NLRB factors in their favor. At the summary judgment stage, the Court is unable to weigh the factors and make a determination about the reasonableness of the employees' expectations. Accordingly, summary judgment for both defendants and plaintiffs on Voisard's status as an employer is denied.

## II. Business Circumstances Exception

Defendants move for summary judgment on the claim that they are entitled to the protection of the "unforeseeable business circumstances exception" to the 60 days' notice requirement in the WARN Act.

The WARN Act's notice period is reduced or eliminated if the closing is "caused by business circumstances that are not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(A).

To obtain the protection of the business circumstances exception, the employer must show, (1) the circumstances were unforeseeable, and (2) the layoffs were caused by those circumstances. *See Roquet v. Arthur Andersen, LLP,* 398 F.3d 585, 588 (7th Cir. 2005)*,* and *Halkias v. General Dynamics Corporation,* 137 F.3d 333 (5th Cir. 1998).

The Code of Federal Regulations gives guidance on what types of business circumstances will be considered "not reasonably foreseeable" and has "eschewed *per se* rules and instead encouraged a case-by-case examination of the facts." *Roquet,* 398 F.3d at 588. A business circumstance may be reasonably unforeseeable if it was caused by some sudden, dramatic, and unexpected action, or by conditions outside the employer's control." *Id.* citing, 20 C.F.R. § 639.9(b)(1). "When determining whether a mass layoff was caused by unforeseeable business circumstances, courts evaluate whether a similarly situated employer

10

exercising reasonable judgment could have foreseen the circumstances that caused the layoff." *Id.* A company will not be liable if, when confronted with potentially devastating occurrences, it reacts the same way that other reasonable employers within its own market would react. *Watson v. Michigan Indus. Holdings, Inc.*, 311 F.3d 760, 765 (6th Cir. 2002).

Defendants argue that TD Bank's freezing its line of credit caught Voisard by surprise. In the past, TD Bank had always worked with Voisard to modify its loan agreement. While there was a possibility that TD Bank would call Voisard's line of credit, it was not reasonably foreseeable that this would occur.

After review of the relevant caselaw and taking the facts and drawing all inferences in the light most favorable to plaintiffs, the Court cannot say as a matter of law defendants are entitled to the protection of the business circumstances exception.

Certainly the record supports a reading that a reasonable company in Voisard's position would have acted as it did. Trying to regain its footing after the loss of a portion of Grove's business, Voisard petitioned its long-term lender for further assistance when its overdraft was larger than that allowed under the terms of its agreement with TD Bank. When TD Bank refused, Voisard then turned to the mass layoff on January 31, 2014, when it was unable to make payroll.

Nevertheless, the record equally lends itself to an interpretation that size of the overdraft and TD Bank's unwillingness to cover it was not a sudden, dramatic, or unexpected event. Voisard had been having financial difficulties throughout 2013 following Grove's reduction in business. Defendants put forth no evidence that the magnitude of the overdraft was unforeseeable on December 2, 2013, when notice was required to have been given.

11

Voisard had, since at least the end of October 2013, been planning on shutting down operations for three weeks in November and December.  Turning to TD Bank's reaction to the size of the overdraft, the Court is also not persuaded that its reaction was so improbable that defendants are entitled to summary judgment.  The overdraft that TD Bank extended to Voisard was meant to be a temporary occurrence, ending in August 2013.  (Walker Decl. ¶ 17).  It was only extended when Voisard was unable to continue operations without it.  (Walker Decl. ¶ 18).  Voisard and TD Bank engaged in conversations during the next few months about the overdraft.  In early December 2013, Voisard was directed to TD Bank's workout department, who informed Voisard the overdraft had to be reduced and ultimately extinguished. (Walker Decl. ¶ 19).  On January 8, 2014, TD Bank expressed its wish to immediately reduce and then completely eliminate the overdraft. (Walker Decl. ¶ 21).  Walker responded by explaining how this would be detrimental to Voisard, and in the weeks prior to the mass layoff, talks with TD Bank continued about how to reduce the overdraft.  (*Id*.).  These facts imply that TD Bank was unlikely to increase the size of the overdraft.

The Court finds defendants' citations distinguishable.  In *Loeher v. McDonnell Douglas Corp.*, 98 F.3d 1056 (8th Cir. 1996) and *Watson v. Michigan Industrial Holdings, Inc.*, 311 F.3d 760 (6th Cir. 2002), the defendants were faced with the sudden cancellations of contracts with the government and a long term client.  While in *Roquet v. Arthur Andersen LLP*, 398 F.3d 585 (7th Cir. 2005), the defendant did not know it would be indicted as a firm or when the indictment would come down, and in *Hotel Employees and Restaurant Employees Intern. Union Local 54 v. Elsinore Shore Associates*, 173 F.3d 175 (3d Cir. 1999), the hotel management company had no indication of whether or when the Casino Control

12

Commission might revoke its license.  Under those circumstances, the courts concluded that while the businesses knew that a shutdown was possible, the shutdowns were not reasonably foreseeable.  Here, the defendants have not put forward evidence that the amount of the overdraft was unforeseeable on December 2, 2013, the date notice was required to be given.

Based on the present record, the Court is unable to pass judgment on the probability or improbability of the size of the January overdraft.  Consequently, the Court cannot characterize, as a matter of law, the amount of the overdraft or TD Bank's unwillingness to cover it as unforseen, unexpected, or sudden.  Accordingly, summary judgment for defendants must be denied.

### III. Single Employer

Both parties move for summary judgment that Voisard, LGI, and LGP are a "single employer" within the meaning of the WARN Act and are jointly liable for its violation. Courts analyze this issue by employing a five-factor balancing test set forth in the Department of Labor ("DOL") regulation issued under the WARN Act.  *Pearson v. Component Tech. Corp.*, 247 F. 3d 471, 489 (3d Cir. 2001).  These factors include: "(i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations." 20 C.F.R. § 639.3(a)(2); *see also Guippone v. BH S & B Holdings LLC*, 737 F.3d 221, 226 (2d Cir. 2013) (adopting the DOL factors to determine if entities are single employers); *Swallows v. Barnes & Noble Book Stores, Inc.,* 128 F.3d 990, 993–94 (6th Cir. 1997) (citing a similar set of factors for determining whether two companies may be treated as a "single employer" in an employment discrimination suit).

These factors "are meant as a nonexhaustive list" so as to allow courts to "[exercise] the flexibility that this area of law requires." *Pearson,* 247 F.3d at 491.  The question of whether entities constitute a "single employer" for WARN Act purposes "is ultimately an inquiry into whether . . . two nominally separate entities operated at arm's length" or whether, following an "assessment of the amount of control" exercised by one entity over another, it can be determined that two entities should be considered jointly liable for the closing and the subsequent lack of notice. *Id.* at 495-96.

Typically, the presence of only common ownership and common management will not establish liability. *Id* at 494.  "The last three factors—de facto exercise of control, unity of personnel policies emanating from a common source, and dependency of operations—are often the determinative factors." *Hampton v. Navigation Capital Partners, Inc.*, No. CV 13 747 LPS, 2014 WL 4100418, at *3 (D. Del. Aug. 19, 2014) (*citing In re APA Transport*, 541 F.3d 233 (3d Cir. 2008)).  Among the three, de facto exercise of control is the most important.  The de facto control factor involves a determination as to whether one company "was the decision-maker responsible for the employment practice giving rise to the litigation." *In re APA Transp.,* 541 F.3d at 245 (internal quotation marks omitted).  A "particularly striking" showing of de facto control can warrant liability even in the absence of the other factors.  *Pearson,* 247 F.3d at 504.

The fourth factor looks to whether there was a "unity of personnel policies."  The overall question is whether the companies "actually functioned as a single entity with regard to [their] relationship[ ] with employees." *Id.* at 499.  To reach an answer, courts consider whether the two companies in question engaged in centralized hiring and firing, payment of

14

wages, and personnel and benefits recordkeeping. *See Vogt v. Greenmarine Holding*, 318 F. Supp. 2d 136, 142-43 (S.D.N.Y. 2004).

Finally, the fifth factor considers whether there was a dependency of operations between the two companies.  Courts must look to the "existence of arrangements such as the sharing of administrative or purchasing services, interchanges of employees or equipment, and commingled finances.*"  In re APA Transp*., 541 F.3d at 245 (internal quotation marks omitted).  This factor "cannot be established [merely] by the parent corporation's exercise of its ordinary powers of ownership, i.e; to vote in directors and set general policies." *Pearson*, 247 F.3d at 501. Instead, this factor requires that "plaintiffs [ ] establish the existence of what was known at common law as a 'master-servant' agency relationship." *Id.*

Plaintiffs argue that they are entitled to summary judgment on the issue of LGP and LGI's status as a single employer with Voisard.  They note that all three of the entities have common ownership.  Walker and Constein served as directors of all three entities and were responsible for employment and financial decisions at Voisard.  There is also an interrelatedness of operations given Voisard's payment of millions of dollars in management fees to the LGP.  Walker and Constein were also responsible for the decision of the mass layoff on January 31, 2014.

Defendants contend that LGP and LGI were not in de facto control of Voisard. Defendants note that the default rule is that subsidiaries are treated as separate entities from their parent companies.  While there was commonality of officers between Voisard, LGP, and LGI, that in and of itself is not enough to impose liability under the WARN Act.  There is no evidence in the record that LGP and LGI disregarded Voisard's separate legal personality by

15

directing it to act.  There is no unity of personnel policies, as Voisard had its own

management team.  Nor is there any unity of operations because LGP and LGI have none.

After review, the Court finds that the three companies together constitute a single

employer.  In reaching this decision, the Court notes that the WARN Act like other federal

labor statutes, has as its goal the protection of workers and that "wrongdoer should not escape

liability merely because corporate formalities are observed." *Watts v. Marco Holdings, Inc.,*

No. 3:95CV88 BA, 1997 WL 578783, at *4 (N.D. Miss. Aug. 8, 1997*) (internal citation

omitted).

It is undisputed that there was common ownership and management between Voisard,

LGP, and LGI.  The first two DOL factors, though the least important, are clearly established

in plaintiffs' favor.  The Court finds that the "unity of personnel policies" weighs in favor of

neither party.  LGI and LGP had no employees.  Consequently, they lacked any personnel

policies of their own.  However, the Court finds that the "dependancy of operations" factor

weighs in favor of plaintiffs.  LGP's only operations appear to be the management fees it

received from Voisard. *Cf. Backus v. Mena Newspapers, Inc*., 224 F. Supp. 2d 1228, 1232

(W.D. Ark. 2002) (noting the payment of management fees by a subsidiary to a parent as one

factor in support of single employer status in a Title VII case).

Turning to de facto exercise of control, the Court finds that LGP and LGI exercised de

facto control over Voisard.  Walker and Constein were the only two officers and directors of

the company.  They made the employment and financial decisions at Voisard since it was

purchased in 2003, for which LGP was paid management fees.  And importantly, Walker and

Constein were responsible for the mass layoff on January 31, 2014.  They were "the decision-

maker responsible for the employment practice giving rise to the litigation." *In re APA*

*Transp.,* 541 F.3d at 245.  On balance, these facts demonstrate LGP and LGI's de facto control of Voisard.

Taken as a whole, the DOL's factors support a finding that Voisard, LGP, and LGI operated as a single employer.  As such, summary judgment in favor of plaintiffs on this point is granted.

### IV. State Law Claims

Finally, defendants move for summary judgment on plaintiffs' state law claims. Defendants contend that plaintiffs' claim for violation of Ohio Revised Code § 4141.28(c) fails because the statute only requires employers to notify the Ohio Department of Job and Family Services before a mass layoff.  As the statute does not provide for damages or penalties in the event of employer failure to comply with the statute, plaintiffs have no cause of action under it.  Plaintiffs fail to respond to defendants' argument.  The Court, having found no caselaw that supports O.R.C. § 4141.28(c)'s creation of a private cause of action, grants defendants' motion for summary judgment on this claim.

Defendants also contend that they are entitled to summary judgment on plaintiffs' unjust enrichment claim.  Plaintiffs do not respond.  Accordingly, the Court grants summary judgment for defendants on this claim as well.

### <u>Conclusion</u>

For the reasons set forth above, summary judgment for plaintiffs is GRANTED as to LGI and LGP's status as a "single employer" with Voisard.  Summary judgment for defendants is GRANTED on their non-liability under O.R.C. § 4141.28(c) and plaintiffs' unjust enrichment claim.  Summary judgment on all other grounds is DENIED.

17

IT IS SO ORDERED.


                                        /s/ Patricia A. Gaughan
                                        PATRICIA A. GAUGHAN
                                        United States District Judge
Dated: 1/27/15